IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SUMAYA HAMADMAD, | : | |
| | : | Civil Action No. _____ |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| WALTER ("TED") CARTER JR., | : | |
| in both his official capacity as | : | |
| President, The Ohio State University, | : | |
| and in his individual capacity, | : | |
| | : | JUDGE |
| and | : | |
| | : | MAGISTRATE JUDGE |
| SUSAN LIU, in both her official | : | |
| capacity as Detective, The Ohio | : | |
| State University Police Division, | : | |
| and in her individual capacity, | : | |
| | : | **J**URY **D**EMAND **E**NDORSED **H**EREON |
| Defendants. | : | |

**COMPLAINT**

**I.     Preliminary Statement**

1.     This action seeks compensatory and punitive damages; declaratory, injunctive, and equitable relief; prejudgment and post-judgment interest; and attorneys' fees and costs for the (a) false arrest; (b) malicious prosecution; (c) as-applied violation of the First Amendment when University Space Rules ("USR") were implemented on the morning of April 25, 2024, to expel from the South Oval individuals who were expressing or perceived to be expressing viewpoints similar to an early morning protest with tents, and to arrest those who did not comply, more than seven hours before a second wave of large group protesters sought to construct an encampment; and/or (d) retaliatory viewpoint-focused arrest in violation of the First Amendment committed

1

when Defendants expelled these individuals from the South Oval because they wanted to prevent the perception of a hostile learning environment for Jewish students offended by criticism of Israel for its actions in the Israeli-Gaza conflict.

## II. Jurisdiction and Venue

2. This action invokes the federal question, civil rights, and supplemental jurisdiction of this Court pursuant to 28 U.S.C. §§ 1331; 1343; 1367.

3. Declaratory, injunctive, and equitable relief are sought pursuant to 28 U.S.C. §§ 2201; 2202; Fed.R.Civ.P. 65, and the common law of the State of Ohio.

4. Compensatory and punitive damages may be awarded against Defendants in their individual capacities under 42 U.S.C. § 1983 and the common law of the State of Ohio.

5. Costs may be awarded pursuant to Fed.R.Civ.P. 54, while attorneys' fees may be awarded under 42 U.S.C. § 1988 and the common law of the State of Ohio.

6. Venue lies in this forum pursuant to 29 U.S.C. § 1391(b) and S.D. Civ. R. 82.1 because Defendants acted pursuant to their employment by The Ohio State University ("OSU") at its main campus located in Franklin County and their acts and omissions giving rise to this action occurred in that County.

## III. Parties

7. Plaintiff Sumaya Hamadmad has, at all times material to this action, been a research scientist in the Department of Ophthalmology and Vision Science at the OSU College of Medicine, had never been arrested before the Gaza protests and did not remain on the South Oval in order to be arrested, instead remaining there only while questioning the authority to remove her for sitting on the grass with two other people.

8. Defendant Walter "Ted" Carter Jr. is President of OSU, a higher education instrumentality of state government, and is being sued, for purposes of prospective injunctive relief, in his official capacity and for damages in his personal capacity, acted at all times material to this action under color of law and wielded policymaking authority to declare that peaceful and nondisruptive individuals were committing criminal trespass by remaining on the South Oval after being told by campus police to leave due to their actual or perceived political beliefs, closely monitored through information from subordinates and video the protests at issue in this action, and communicated, directly or indirectly, his approval of those protesters' arrests.

9. Defendant Detective Susan Liu is being sued in both her individual and official capacities at the OSU Police Division; signed the criminal Complaint against Plaintiff and participated in the decision to arrest her on a charge of criminal trespass; upon being directed by her superiors, would arrest and charge Plaintiff again if she participates in peaceful and nondisruptive protest that Defendant Carter or his staff acting under his direction declare criminal trespassing; and, at all times material to this action, has acted under color of law.

### IV. Facts

10. As of April 2024, the State of Israel was engaged in conflict in Gaza.

11. Across the country students on university and college campuses engaged in mass protests critical of Israel's prosecution of military operations in Gaza, and those protests often involved constructing encampments where protesters lived.

12. OSU has investments in entities that support Israel's government and military, and protesters have sought disclosure of all OSU relationships that support Israel and divestment of its investments.

13. The South Oval at OSU, located in front of the Student Union, has for decades been used during protests as the area where students, faculty, staff, and visitors could, without being charged a fee for their presence or entirely satisfying the USR's requirements of registration and limits on use of the South Oval, congregate, chant, and otherwise make known their position on matters of public concern.

14. OSU routinely permits expressive activities when the matter of public concern involves favored subjects, such as support of its athletic teams; indeed, OSU promotes the space on its website, https://slec.osu.edu/explore-venues/outdoor-event-spaces/south-oval: "The South Oval, situated at the heart of the campus, offers a beautiful and expansive setting for a wide range of events. Its picturesque surroundings make it the perfect backdrop for special occasions, from inflatables and interactive activations to tailgates and table fairs. The wide, open space is ideal for hosting food trucks, live performances, and community gatherings, providing endless possibilities for event planning. Whether you're organizing a festival, promotional program, or large-scale celebration, the South Oval's central location and versatility make it an exceptional venue."

15. Over the decades, broadcast and print media have extensively covered protests on the South Oval.

16. Students, faculty, staff, and visitors critical of OSU acts or omissions lack an alternative channel of communication that is as well known, readily available, free, and covered by news reporters as the South Oval, and suppressing expressive and associational activity there unreasonably prevents meaningful exercise of the First Amendment.

17. Early in the morning on April 25, 2024, a protest against Israel and OSU's involvement with Israel began on the South Oval with approximately 40 protesters, some of whom set up camping equipment, including tents.

4

18. At approximately 9:30 a.m., OSU police ordered that all camping equipment be taken down on the South Oval, and protesters complied.

19. Less than a half hour later OSU police returned and ordered the protesters to disperse because they were a continuation of a protest that had had tents even though they no longer had the tents. The protesters were told that if they dispersed and returned as a study group, that would be a different scenario. The protesters then dispersed.

20. Only later, starting around 5:30 p.m., did a larger group of protesters attempt to construct encampments, and, starting around 10:00 p.m., mass arrests were made. These arrests are not at issue in this action.

21. Later that morning, Plaintiff became aware that the protest at the South Oval had been dispersed, and she decided to travel to the South Oval to observe the situation.

22. Plaintiff arrived on campus between 10:30 a.m. and 11:00 a.m. and parked in the Ohio Union Parking Garage.

23. Ten minutes or so later she arrived at the South Oval and, after initially sitting on a bench, switched to sitting on the grass with two other individuals.

24. This group lacked signs and did not actively protest; however, one was wearing a keffiyeh, a headdress commonly associated with the Palestinian cause, and Plaintiff was wearing a black headscarf, in the aggregate giving a clear impression to any reasonable observer that she was critical of Israel's actions in Gaza and OSU's involvement with Israel and expressing her association with protesters who shared that criticism.

25. Within ten minutes, a campus police officer came over to Plaintiff and told her that she needed to leave. Plaintiff and the others talked to that officer for approximately two minutes,

at which point he left. A few minutes later, the officer returned with a group of other officers and again told Plaintiff was told that she could not be present on the South Oval.

26. At this time, numerous other individuals nearby were making use of the South Oval, both walking, standing, and sitting. None of these individuals were approached by campus police officers.

27. Plaintiff then identified herself as a faculty member, explained that she was not engaging in any disruptive activity, and questioned the officer about why she had to leave.

28. Plaintiff explained that she had come to the United States in part because tyrannical behavior occurred where she had been living.

29. That conversation lasted for approximately ten minutes, and the officers decided to arrest her.

30. Below is an illustration that fairly and accurately depicts the location of the original protest and the location of Plaintiff's arrest approximately 75 feet away from the original protest encampment:



31. Plaintiff was detained for the rest of the day, incarcerated, and released on bond at approximately 10 p.m.

32. Plaintiff was incarcerated at Franklin County Corrections Center II, located at 2460 Jackson Pike, Columbus, OH 43223. During her incarceration, her head scarf was removed, and she was strip searched near an open door with male officers in the vicinity. Her mug shot was taken without her headscarf.

33. Plaintiff was charged in a criminal Complaint signed on April 25, 2024, by Defendant Liu with Criminal Trespassing for recklessly remaining on the South Oval despite multiple warnings and advisements about her unauthorized presence, and that criminal complaint reflected why Plaintiff was arrested and served as the charging document, relied upon by Columbus Ohio Division of Police authorities and City of Columbus prosecutors to prosecute her.

34. The charge of Criminal Trespassing was later dismissed unconditionally.

35. Plaintiff consistently maintained her innocence of that charge and refused to plead to any offense or bargain about avoiding prosecution.

36. OSU received considered internal and external criticism of the arrests, including feedback from lawyers and professors knowledgeable about First Amendment precedent.

37. On April 29, 2024, Defendant Carter sent an email, https://president.osu.edu/story/message-042924, to the campus community about the April 25th arrests, which began with, "Listening to the feedback from our community over the last several days, I want to set the record straight," and declared, "I value and welcome free speech." His concern about criticism was palpable: "I acknowledge that even with additional facts about the

incident and the timeline of events, some will continue to disagree with the actions taken. I accept that criticism and will always listen to others' concerns. In short, I take my responsibilities very seriously and am accountable for outcomes. Arrests are not an action that I or any member of the administration take lightly. I have stated since the first day I was announced as president that safety will not be compromised."

38. He described the protesters as engaging in "an intentional violation of university space rules that exist so that teaching, learning, research, service and patient care can occur on our campuses without interruption."

39. At no time did Plaintiff intentionally violate any rule that disrupted teaching, learning, research, service, and/or patient care.

40. Defendant Carter stated that notice about clearing the South Oval for expressive and associational activity had been given repeatedly on April 25, starting at 4:30 a.m. and continuing.

41. He lamented that an encampment was attempted by a group of more than 300 protesters, which was the number of evening protesters, with arrests for criminal trespass made because encampments are not permitted "regardless of the reason for them."

42. He explained that safety and security resources needed to be reassigned, there was "undue pressure on proximate buildings, in this case the Ohio Union, for restrooms and personal hygiene," as well as disruption of students studying for final exams and use of the Union as an exam location.

43. Defendants never had any justifiable reason to believe that Plaintiff was part of the encampment.

44. Defendants lacked probable cause to believe that Plaintiff was recklessly engaging in criminal trespass.

45. Defendants' order that Plaintiff leave the South Oval violated her First Amendment rights of expression and association because she was not engaged in any disruptive protesting and closing the South Oval for expressive and associational activity was, to the extent the South Oval was a public forum, neither narrowly tailored nor consistent with leaving ample alternative channels of communication, or, to the extent it was a limited public forum, both unreasonable in light of the purpose served by the South Oval and viewpoint-focused.

46. Acts or omissions of Plaintiff that were protected by the First Amendment could not in and of themselves provide probable cause for the charge of criminal trespassing.

47. On their face, the USR appear to be reasonable time, place, and manner restrictions of a public forum, adopted, according to ¶ A, for "promoting the free exchange of ideas" while "ensuring the continued safe and effective operation of the University."

48. Their overall approach is that the "[u]se of University space is reserved for the direct and indirect support of the University's teaching, research, and service missions, the University's administrative functions, and students' campus-life activities," with access or use limited "as may be necessary to provide for the orderly conduct of" those University functions.

49. Activities or events that support those functions may have "outdoor spaces" reserved, and ¶ B permits large-scale events to be registered by student organizations and others, including non-affiliates, but OSU "may require reasonable time, place and manner limitations be placed on usage to ensure that the usage does not disrupt the University's mission, administrative functions, or other campus-life activities."

50. OSU preserves "its sole discretion and subject to change based upon the operational needs of the University" to designate closed spaces.

51. The USR are extensive, and, in pertinent part, they list rules in ¶ D including ensuring accessibility and emergency egress paths, and ¶ D.3 addresses the "Main Oval," by which OSU means the "North Oval," which has crisscrossing pathways, and "[i]n the warmer months, you can find a dozen tables of campus organizations selling things, recruiting, fundraising, or informing. There are students sprawled on the grass and filling the picnic tables trying to make studying a little more enjoyable." https://u.osu.edu/3020sp24/2024/01/28/how-ohio-states-oval-acts-as-a-symbolic-watershed-for-its-students/

52. Disruptive noise is limited in ¶ D.4., and again OSU preserves "its sole . . . discretion" to make exceptions, with requests being submitted at least 48 hours in advance.

53. Under ¶ D.5, "Equipment, Signs and Structures" may not be "attached or affixed" without prior approval, while ¶ D.6 prohibits setting up "tents or other temporary structures requiring staking" without prior approval and subject to size restrictions and Ohio Department of Commerce permitting.

54. In ¶ F, the USR summarizes their scope: Disruption "in any form" of "University business" is forbidden, and, "[w]hen enforcing these rules, an official or employee authorized to maintain order on the campus or facility should make a reasonable attempt to warn and advise registered student organizations, students, faculty, staff and non-affiliates to cease the prohibited conduct or activity before citing and/or arresting the individual for violation of these rules, except where the conduct violating these rules reasonably appears to create a threat to or endanger health, safety or property."

55. As applied, the USR has been interpreted by Defendants to empower OSU to declare the South Oval, which is either a public forum or a limited public forum, a closed space incompatible with future peaceful and nondisruptive expressive and associational activity, notwithstanding the protesters' willingness to remove tents or an encampment and the advent of different protesters separate from those who had constructed an encampment and regardless of how timely a protest on a pressing matter of public concern that was coordinated with others could communicate the protesters' beliefs.

56. As applied, the USR grants sole and total discretion to OSU to declare peaceful and nondisruptive expressive and associational activity off limits on the South Oval thereby imposing a prior restraint on activity protected by the First Amendment.

57. In reviewing the criticism received for the arrests late on the evening of April 25, 2024, Defendants must have realized that they overreacted to the protest, and they responded differently on May 1, 2024, by permitting without any arrests or even notable incidents, and most likely without formal satisfaction of USR registration and other requirements, more than 700 protesters against Israel on the South Oval who were chanting slogans, including "Disclose, divest, we will not stop, we will not rest!", engaging in Muslim prayers, and waving Palestinian flags or posters, such as a May Day one declaring, "Repression won't stop our solidarity with Palestine! Divest & end the genocide on Gaza!"

58. A heavy law enforcement presence monitored the May 1, 2024, protests, buildings were locked or had limited access, and nearby parking lots were closed.

59. Similar efforts could have readily accommodated the protesters on April 25, 2024, once the tents and encampments were removed.

60. Defendant Carter's email did not reveal the actual reason motivating OSU's arrests for criminal trespassing.

61. The general reasons in the USR cited by Defendant Carter could be used to censor every group protest activity on the South Oval because some burden on buildings, resources, and activities is intrinsic to large groups and unavoidable when matters of such public concern as Israel's disproportional response to Hamas and its ties to OSU are the subject.

62. OSU has a significant number of Jewish students; one of the leading Hillel operations, starting as the third in the United States, growing into a remarkable building housing a library, rooms for meetings, offices for Hillel Staff, an auditorium, an art gallery, and two firsts for any Hillel Foundation: a fitness center, and a Kosher restaurant, and striving to become a home away from home for Jewish students; and physical buildings and operations benefiting from Jewish philanthropists, such as the Wexner Medical Center, the Schottenstein Center, and the Melton Center for Jewish Studies.

63. On or about April 9, 2024, three Jewish organizations filed a complaint with the United States Department of Education's Office for Civil Rights against OSU alleging that it had fostered "a hostile antisemitic environment that is now pervasive" in violation of Title VI of the Civil Rights Act of 1964.

64. They specifically referred to the Hamas attack on October 7, 2023, and alleged that since then Jewish students had faced incidents including verbal taunts and threats, graffiti in classrooms, removal of posters and photos of captured Israelis, and physical assault.

65. An earlier and similar complaint was being investigated by the Office of Civil Rights in January 2024, while a parent of an OSU student had complained in 2023 about incidents of harassment because of Jewish ancestry.

66. A leader of one of the groups filing the complaint stated: "Antisemitism is expressed openly; blatant verbal and physical threats and attacks on Jewish students often go unaddressed by the administration. By filing this Title VI federal complaint, we aim to hold the administration accountable."

67. A leader of a second group demanded that OSU act immediately to address incidents and hold violators accountable, "Unfortunately schools like Ohio State that continue to sweep incidents under the rug are getting worse by the day. The problem cannot be ignored."

68. A leader of the third group added, "We believe all the evidence shows that despite a pattern of escalating harassment and intimidation, Ohio State University administrators, faculty and staff repeatedly failed in their duty to protect Jewish and Israeli students from such attacks. We urge the U.S. Department of Education to investigate these incidents and compel the university to take immediate action to address the pervasively hostile environment for Jewish and Israelis on OSU's campus."

69. The complaint detailed incidents such as being accosted by two men who were shouting "Free Palestine" and the same slogan being shouted by students banging on Hillel windows to disrupt a Shabbat dinner and separately being used as graffiti on a student's door.

70. On February 29, 2024, two subordinates of Defendant Carter -- Melissa Shivers, OSU Vice President for Student Life, and Keesha Mitchell, Associate Vice President for the Office of Institutional Equity -- wrote to one of the groups that later filed the complaint: "Through both our words and, importantly, our actions, we continually reaffirm and communicate messaging focused on our expectations regarding an environment of respect and compassion during this extraordinarily difficult time for many on our campuses. * * * It is very disappointing that your

14

letter to us does not accurately represent what has occurred at Ohio State or the university's strong and ongoing response."

71. Their letter quoted Defendant Carter's January 8, 2024 introduction letter that said he is committed to "continually exploring ways in which we can enhance the safety and security of our community" and "[w]e also will remain focused on creating an environment in which respect, civility and compassion are forefront while continuing Ohio State's long-standing commitment to the First Amendment and upholding the laws of our state and country."

72. The percentage of OSU students directly from Muslim countries or related to Muslims eclipses the percentage of Jewish students, and Defendants expected before the April 25, 2024 Gaza protests that such students, as well as others who opposed Israel's actions, would turn out in large numbers because Israel's disproportionate response to the Hamas attack was a matter of international public concern fueling demonstrations on colleges and universities as massive destruction, civilian deaths and injuries, and international law violations were being committed by Israel on a daily basis and depicted on broadcast media, in social media, and over the Internet.

73. OSU was not constitutionally permitted to use censorship, prior restraints, and/or closure in the morning of April 25, 2024, of the South Oval for peaceful and non-disruptive expressive and associational activity to prevent a hostile learning environment for its Jewish students because, however much offense they took at the Gaza protests, that offense was a price paid for First Amendment protected activity, rather than a justification for suppression of that activity due to its anti-Israel viewpoint.

74. Plaintiff was upset and angry upon being told she had to leave the South Oval and suffered emotional distress when she was arrested, detained, and prosecuted in part because her arrest, even without a conviction, is a blemish on her record, and she anticipates being required to

report the arrest on licensing and professional applications; when seeking funding for research projects; and while pursuing career opportunities.

75. Defendants acted in conscious or reckless disregard of Plaintiff's clearly established First Amendment rights.

V. **Claims for Relief**

    A. **False Arrest in Violation for Fourth Amendment and Ohio Common Law**

76. Paragraphs 1-75 are realleged and incorporated herein.

77. By making and/or indispensably contributing to Plaintiff's arrest when no probable cause existed to believe that, while she was peacefully engaging in nondisruptive expressive and associational activity on a matter of public concern and separate from encampments and large group protesters, she was recklessly remaining on the South Oval after being constitutionally ordered to leave, Defendants committed a false arrest in violation of both the Fourth Amendment and the common law of the State of Ohio.

    B. **Malicious Prosecution in Violation of Fourth Amendment and Ohio Common Law**

78. Paragraphs 1-75 are realleged and incorporated herein.

79. By initiating and then participating in a criminal proceeding against Plaintiff that ended in her favor when the charge of criminal trespassing was unconditionally dismissed after she had been detained and incarcerated overnight, and initiating and participating even though no probable cause existed to believe that, while she was peacefully engaging in nondisruptive expressive and associational activity on a matter of public concern and separate from encampments and large group protesters, she was recklessly remaining on the South Oval after being constitutionally ordered to leave, Defendants committed malicious prosecution in violation of both the Fourth Amendment and the common law of the State of Ohio.

  **C.** **As-Applied Violation of First Amendment**

  80. Paragraphs 1-75 are realleged and incorporated herein.

  81. By retaining and exercising sole discretion to close the South Oval in the morning of April 25, 2024, to peaceful and nondisruptive expressive and associational activity on a matter of public concern by individuals, like Plaintiff, who had not engaged in any encampment activities, Defendants suppressed First Amendment protected expression and association without a countervailing government justification for doing so, failing to use narrowly tailored means and to leave open ample alternative channels of communication, and/or acted unreasonably in light of the purpose served by the South Oval and their duty to be viewpoint-neutral, in violation of the First Amendment.

  **D.** **Retaliatory Arrest and Prosecution in Violation of First Amendment**

  82. Paragraphs 1-75 are realleged and incorporated herein.

  83. By having Plaintiff arrested in the morning of April 25, 2024, when she was peacefully and non-disruptively engaging in expressive and associational activity separate from encampments and large group protesters and unconstitutionally ordered to leave the South Oval and doing so pretextually when their actual motivation was protecting Jewish students from speech perceived as offensive even though Plaintiff never made any threats to those students and no violence was imminent or, in light of the number of law enforcement officers, likely to occur, Defendants engaged in viewpoint-focused censorship that violated the First Amendment.

**VI.** **Prayer for Relief**

  WHEREFORE, Plaintiff prays that this Court:

  a. declare that Defendants, jointly or severally, have committed false arrest and malicious prosecution and violated the First Amendment;

b. enjoin Defendants from following USR when, as-applied, it empowers them to exercise sole discretion in determining whether to close the South Oval to peaceful expressive and associational activities that do not disrupt OSU operations and/or their discretion is viewpoint focused and not narrowly tailored to a significant government interest in a way that leaves open ample alternative forms of communication;

c. order such other equitable and injunctive relief as will make them whole;

d. award against Defendants in their individual capacities more than $75,000 in compensatory and punitive damages, including prejudgment and post-judgment interest;

e. award costs and attorneys' fees; and

f. grant such other relief as the Court may deem appropriate.

Respectfully submitted,

By:/s/ *Edward R. Forman*
Edward R. Forman (0076651)
*(eforman@marshallforman.com)*
Samuel M. Schlein (0092194)
*(sschlein@marshallforman.com)*
John S. Marshall (001560)
*(jmarshall@marshallforman.com)*
Helen M. Robinson (0097070)
*(hrobinson@marshallforman.com)*
Madeline J. Rettig (0098816)
*(mrettig@marshallforman.com)*
MARSHALL FORMAN & SCHLEIN LLC
250 Civic Center Dr., Suite 480
Columbus, Ohio 43215-5296
(614) 463-9790
Fax (614) 463-9780

## **JURY DEMAND**

Plaintiff requests a trial by jury of eight (8) persons.

By:<u>*/s/ Edward R. Forman*</u>
Edward R. Forman (0076651)
