UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

SUMAYA HAMADMAD,

      Plaintiff,

  v.

WALTER CARTER, JR., *et al.*,

      Defendants.

:

:

:

Case No. 2:24-cv-4236
Chief Judge Sarah D. Morrison
Magistrate Judge Chelsey M. Vascura

## OPINION AND ORDER

Sumaya Hamadmad brings this action against The Ohio State University President Walter Carter, Jr. and several OSU police officers for alleged violations of federal and state law arising from her arrest on OSU's campus. This matter is before the Court on Defendants' Motion to Dismiss. (ECF No. 17.)

For the reasons below, Defendants' Motion is **GRANTED in part** and **DENIED in part**.

I.    BACKGROUND

The following background draws from the allegations in the Complaint; all well-pleaded factual allegations in the Complaint are considered as true for purposes of the Motion to Dismiss. *See Gavitt v. Born*, 835 F.3d 623, 639–40 (6th Cir. 2016).

On the morning of April 25, 2024, protestors against Israel's actions in Gaza and OSU's involvement with Israel gathered at the South Oval (a space on OSU's campus in front of the student union) and set up camping equipment. (Am. Compl.,

ECF No. 15, ¶¶ 16, 20.) At approximately 9:30 a.m., OSU police ordered that all camping equipment be removed from the South Oval and the protesters complied. (*Id.* ¶ 21.) Subsequently, OSU Police Division Deputy Chiefs Eric Whiteside and Dennis Jeffrey determined that the protest violated OSU's University Space Rules ("USR") because it was a continuation of an event that had improper tents. (*Id.* ¶ 23.) Around 10 a.m., Deputy Chief Whiteside told the protestors that they needed to disperse because of this determination and the protestors complied. (*Id.* ¶¶ 22–23.) Later that evening, another group of protestors attempted to construct encampments on the South Oval. (*Id.* ¶ 25.)

### A. The University Space Rules

The USR provide that the "[u]se of University space is reserved for the direct and indirect support of the University's teaching, research, and service missions, the University's administrative functions, and students' campus-life activities," with access or use limited "as may be necessary to provide for the orderly conduct of" those University functions. (*Id.* ¶ 55.) The USR permit large-scale events to be registered by student organizations and others, including non-affiliates, but OSU "may require reasonable time, place and manner limitations be placed on usage to ensure that the usage does not disrupt the University's mission, administrative functions, or other campus-life activities." (*Id.* ¶ 56.) OSU preserves "its sole discretion and subject to change based upon the operational needs of the University" to designate closed spaces. (*Id.* ¶ 57.)

Under ¶ D.5 of the USR, "Equipment, Signs and Structures" may not be "attached or affixed" without prior approval, while ¶ D.6 prohibits setting up "tents or other temporary structures requiring staking" without prior approval and subject to size restrictions and Ohio Department of Commerce permitting. (*Id.* ¶ 60.)

Per ¶ F of the USR, disruption "in any form" of "University business" is forbidden, and, "[w]hen enforcing these rules, an official or employee authorized to maintain order on the campus or facility should make a reasonable attempt to warn and advise registered student organizations, students, faculty, staff and non-affiliates to cease the prohibited conduct or activity before citing and/or arresting the individual for violation of these rules, except where the conduct violating these rules reasonably appears to create a threat to or endanger health, safety or property." (*Id.* ¶ 61.)

### B. Ms. Hamadmad's Arrest

Ms. Hamadmad is a research scientist in the Department of Ophthalmology and Vision Science at the OSU College of Medicine. (*Id.* ¶ 7.) After learning that the protest had been dispersed, she went to the South Oval to observe the situation. (*Id.* ¶¶ 27–28.) Ms. Hamadmad was wearing a black hijab; she sat on the grass with two people, including a person wearing a checkered keffiyeh (a headdress associated with the Palestinian cause). (Am. Compl. ¶¶ 28–29.)

Within ten minutes, an OSU police officer told Ms. Hamadmad that she needed to leave. (*Id.* ¶ 30.) Ms. Hamadmad and the other members of her group talked to that officer for about two minutes, after which point he left. (*Id.*) A few

3

minutes later, Ms. Hamadmad was approached by Lt. Alan Horujko and several other officers who again told her to leave. (*Id.* ¶ 31.) She identified herself as a faculty member and questioned why she had to leave. (*Id.* ¶ 33.) At the time of this conversation, other people nearby were walking, standing, and sitting on the South Oval but those other people were not approached by OSU police officers. (*Id.* ¶ 32.) Lt. Horujko then directed two officers to arrest Ms. Hamadmad; her arrest occurred about 75 feet away from the site of the original encampment. (*Id.* ¶¶ 36–37.)

She was detained for the rest of the day, incarcerated, and released on bond at 10:00 p.m. (*Id.* ¶ 38.) During her incarceration, her mug shot was taken without her headscarf and she was strip searched near an open door with male officers in the vicinity. (*Id.* ¶ 39.) Ms. Hamadmad was charged with criminal trespassing in a criminal complaint signed by Detective Susan Liu, but the charge was later dismissed unconditionally. (*Id.* ¶¶ 40–41.)

Ms. Hamadmad was upset when she was told to leave the South Oval and she suffered emotional distress when she was arrested, detained, and prosecuted. (*Id.* ¶ 81.) She anticipates being required to disclose her arrest on licensing and professional applications, when seeking funding for research projects, and while pursuing career opportunities. (*Id.*)

### C. President Carter's Communications

On April 29, 2024, President Carter emailed the campus community about the April 25, 2024 arrests; in that email, he explained that the protestors involved in creating an encampment had been repeatedly notified throughout the day that

4

they were in violation of the USR. (Am. Compl. ¶¶ 44–45, 47–49.) His email stated, among other things, that "I take my responsibilities very seriously and am accountable for outcomes. Arrests are not an action that I or any member of the administration take lightly." (*Id.* ¶ 44.)

### D. The May 2024 Protests

On May 1, 2024, OSU permitted, without any arrests, more than 700 protesters on the South Oval who were chanting slogans, engaging in Muslim prayers, and waving Palestinian flags or posters. (Am. Compl. ¶ 64.)

## II. STANDARD OF REVIEW

Defendants move to dismiss Ms. Hamadmad's Claims under Rules 12(b)(1) and 12(b)(6).

Before a court may determine whether a plaintiff has failed to state a claim upon which relief may be granted, it must first find that it has subject matter jurisdiction. *Mitchell v. BMI Fed. Credit Union*, 374 F. Supp. 3d 664, 666–67 (S.D. Ohio 2019) (Marbley, J.) (citation omitted). Rule 12(b)(1) provides that the defendant may move to dismiss based on a "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). The standard of review of a motion to dismiss for lack of subject matter jurisdiction depends on whether the defendant makes a facial or factual challenge. *Gentek Bldg. Prod., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). Only a facial attack, which "questions merely the sufficiency of the pleading," is present here. *Id.* (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)). A facial attack requires the district court to "take[ ] the allegations in the complaint as true." *Id.* The plaintiff has the burden of proving

5

jurisdiction when subject matter jurisdiction is challenged. *Rogers v. Stratton Indus.*, 798 F.2d 913, 915 (6th Cir. 1986).

A motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted "is a test of the plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations." *Golden v. City of Columbus*, 404 F.3d 950, 958–59 (6th Cir. 2005). Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with sufficient specificity to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal alteration and quotations omitted). A complaint which falls short of the Rule 8(a) standard may be dismissed if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The Supreme Court has explained:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations and quotations omitted). The complaint need not contain detailed factual allegations, but it must include more than labels, conclusions, and formulaic recitations of the elements of a cause of action. *Id.* (citing *Twombly,* 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not

6

suffice." *Id*. In reviewing a motion to dismiss, the Court "construe[s] the complaint in the light most favorable to the plaintiff[.]" *DirecTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).

### III. ANALYSIS

Ms. Hamadmad asserts six claims for declaratory, injunctive, and monetary relief: false arrest under Ohio law and the Fourth Amendment (Claims 1 and 2, respectively), malicious prosecution under Ohio law and the Fourth Amendment (Claims 3 and 4, respectively), an as-applied First Amendment challenge to the USR (Claim 5), and First Amendment retaliatory arrest (Claim 6). Her constitutional claims are brought pursuant to 42 U.S.C. § 1983. Defendants move to dismiss all of her claims.

#### A. Ms. Hamadmad lacks Article III standing to seek declaratory or injunctive relief.[1]

Ms. Hamadmad seeks declaratory and injunctive relief, including an injunction prohibiting Defendants from enforcing the USR to close the South Oval at Defendants' discretion. (Am. Compl., PAGEID # 134–35.) The Court finds she lacks Article III standing for this relief.

---

[1] Although neither party has briefed Article III standing, both have briefed whether Ms. Hamadmad satisfies the *Ex parte Young* exception to Eleventh Amendment immunity as to her claims for prospective relief, including the requirement that she allege an ongoing or imminent violation of her rights. "[A]t the point that a threatened injury becomes sufficiently imminent and particularized to confer Article III standing, that threat of enforcement also becomes sufficient to satisfy this element of *Ex parte Young*." *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015). Thus, in its *sua sponte* Article III standing analysis, the Court will consider the parties' arguments on the imminent or ongoing violation element of the *Ex parte Young* exception.

Pursuant to Article III of the United States Constitution, standing is necessary to the exercise of jurisdiction and "determin[es] the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "Once standing concerns arise—whether raised by defendants, or *sua sponte* by the Court in meeting its obligation to ensure its own jurisdiction—[p]laintiffs carry the burden to establish that standing requirements are met." *Solis v. Emery Fed. Credit Union*, 459 F. Supp. 3d 981, 988 (S.D. Ohio 2020) (Cole, J.) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337–39 (2016)).

Injury is "the '[f]irst and foremost' of standing's three elements." *Spokeo*, 578 U.S. at 338 (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103 (1998)). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.' " *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "The threat of future harm can satisfy this requirement as long as there is a 'substantial risk' that the harm will occur" but " '[a]llegations of *possible* future injury' are not sufficient." *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 405 (6th Cir. 2019) (quoting *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409, 414 n.5 (2013)).

"'[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought.'" *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)). "[T]he type of harm alleged impacts the available relief." *Simpson-Vlach v.*

8

*Michigan Dep't of Educ.*, No. 22-1724, 2023 WL 3347497, at *4 (6th Cir. May 10, 2023) (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)); *Kanuszewski*, 927 F.3d at 406). "While allegations of past injury permit a plaintiff to seek compensatory relief, allegations of ongoing or future harm permit a plaintiff to seek declaratory or injunctive relief." *Id.* (citing *Kanuszewski*, 927 F.3d at 406; *City of Los Angeles v. Lyons*, 461 U.S. 95, 106 (1983)).

Ms. Hamadmad does not allege that she plans to engage in future expressive activity on the South Oval. Even if she had, she lacks a reasonable fear of future arrest because she alleges that Defendants have since permitted large and expressive protests on the South Oval without any arrests. Thus, she has failed to plead ongoing or a threat of future harm to her flowing from Defendants' enforcement of the USR.

Ms. Hamadmad argues that Defendants' likelihood of quelling future peaceful protests is "hardly speculative," citing general pressure on university leaders from executive orders, press statements, and congressional investigations. (Pl.'s Resp. ECF No. 18, PAGEID # 183–86.) But she fails to explain how this pressure increases the likelihood of Defendants enforcing the USR against *her* expressive activity on the South Oval in the future, especially where Defendants have since allowed protests on the South Oval without incident.

Since Ms. Hamadmad has failed to sufficiently allege an ongoing or future injury, she lacks standing to seek injunctive or declaratory relief.

Accordingly, her Claims are **DISMISSED** to the extent that she seeks declaratory and injunctive relief.

### B. Eleventh Amendment immunity bars Ms. Hamadmad's Claims against Defendants in their official capacities.

"Eleventh Amendment immunity 'bars all suits, whether for injunctive, declaratory or monetary relief, against the state and its departments, by citizens of another state, foreigners or its own citizens.'" *McCormick v. Miami Univ.*, 693 F.3d 654, 661 (6th Cir. 2012) (quoting *Thiokol Corp. v. Dep't of Treasury*, 987 F.2d 376, 381 (6th Cir. 1993)). This immunity extends to claims filed against state officers or employees in their official capacities, as those suits are "'no different from a suit against the State itself.'" *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 654 (S.D. Ohio 2016) (Graham J.) (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)). "A suit against OSU is the same as a suit against Ohio because OSU, like Ohio's other public universities, qualifies as an arm of the state." *Id.* (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 571 (6th Cir. 2000)). Defendants, as OSU officials and employees, are thus immune to Ms. Hamadmad's Claims in their official capacities.

Ms. Hamadmad does not dispute that Eleventh Amendment immunity applies to Defendants, but argues that the *Ex parte Young* exception to such immunity allows her to bring her claims for prospective injunctive relief against them in their official capacities. As discussed above, however, she lacks standing to seek such relief.

Accordingly, Ms. Hamadmad's Claims against Defendants in their official capacities are **DISMISSED**.

### C. The Court lacks jurisdiction over Ms. Hamadmad's state-law claims (Claims 1 and 3).

Defendants argue that they are also immune in their individual capacities under Ohio Rev. Code. § 2743.02(F) and Ohio Rev. Code § 9.86 from Claims 1 and 3.

Ohio law grants civil immunity to state officers and employees in their individual capacities unless the officer's or employee's actions were "manifestly outside the scope of his employment or official responsibilities" or "with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 9.86. Ohio law mandates that the determination of whether a state employee was acting within the scope of his employment is exclusively the province of the Ohio Court of Claims. Ohio Rev. Code. § 2743.02(F).

"Under Ohio law, then, state employees may not be sued unless and until it has been determined by the Court of Claims that they are not entitled to immunity." *Haynes v. Marshall*, 887 F.2d 700, 704 (6th Cir. 1989). In other words, a federal court may not exercise pendent jurisdiction over state claims regarding the individual liability of an "Ohio state employee . . . unless and until the Ohio Court of Claims determines he is not entitled to immunity." *Powell v. Morris*, 184 F.R.D. 591, 596–97 (S.D. Ohio 1998) (Marbley, J.). The Court thus lacks jurisdiction over Claims 1 and 3 against Defendants in their individual capacities.

Accordingly, Claims 1 and 3 against Defendants in their individual capacities are **DISMISSED**.

11

### D. Ms. Hamadmad's § 1983 Claims (Claims 2, 4, 5, and 6)

#### 1. Ms. Hamadmad's Complaint fails to plead the personal involvement of certain Defendants for certain claims.

Defendants argue that Ms. Hamadmad failed to plead the requisite personal involvement of certain Defendants for some or all of her § 1983 Claims (Claims 2, 4, 5, and 6).

To hold an individual defendant liable under § 1983, a plaintiff must allege "personal involvement" in the alleged unconstitutional conduct. *See Grinter v. Knight*, 532 F.3d 567, 575 (6th Cir. 2008) (personal involvement is required for personal liability). Section 1983 does not "incorporate doctrines of vicarious liability[,]" so a defendant is not automatically liable for the acts of those they supervise. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986). Rather, to incur liability, a defendant must have directly participated in or encouraged an unconstitutional act. *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012). Conclusory allegations of unconstitutional conduct are insufficient to state a § 1983 claim; a complaint must contain either direct or inferential factual allegations as to each individual defendant.

##### a) President Carter

Defendants argue Ms. Hamadmad failed to plead the requisite personal involvement of President Carter for her § 1983 claims.

Ms. Hamadmad's only relevant allegation about President Carter is that he sent a campus-wide email critical of the encampment that protestors set up at the

12

South Oval. This is insufficient to establish that President Carter took any action to cause or implicitly approve of the alleged unlawful conduct towards her.

Ms. Hamadmad attempts to liken this case to *Cooperrider v. Woods*, 127 F.4th 1019 (6th Cir. 2025). There, the plaintiffs were allowed to proceed on a First Amendment retaliation claim because the complaint contained well-pled factual allegations that the defendants had "directly addressed the speech of [plaintiff]" in public statements and in internal e-mails suggesting " a concerted effort to deprive [the plaintiffs] of their alcohol licenses[.]" *Id.* at 1038–39. But she has not alleged that President Carter made any statements directly addressing *her* expressive conduct, nor has she alleged facts suggesting President Carter approved, authorized, or knowingly acquiesced to the alleged violation of her constitutional rights.

Accordingly, Claims 2, 4, 5, and 6 against President Carter in his individual capacity are **DISMISSED**.

### b) Detective Liu

Defendants also argue Ms. Hamadmad failed to plead the requisite personal involvement of Detective Liu.

The only allegation about Detective Liu is that she signed the complaint instituting criminal trespass charges against Ms. Hamadmad *after* other officers arrested her. And as to Ms. Hamadmad's malicious prosecution claim, she does not allege that Detective Liu had any role in the decision to prosecute her or that the criminal complaint contained false information. "[A] police officer cannot be liable

13

for Fourth Amendment malicious prosecution when [s]he did not make the decision to bring charges, as long as the information [s]he submitted to the prosecutor is truthful." *Kinkus v. Vill. of Yorkville, Ohio*, 289 F. App'x 86, 91 (6th Cir. 2008); *cf. Sykes v. Anderson*, 625 F.3d 294, 317 (6th Cir. 2010). Thus, Ms. Hamadmad fails to allege the requisite personal involvement by Detective Liu.

Claims 2, 4, 5, and 6 against Detective Liu in her individual capacity are **DISMISSED**.

### c) Lt. Horujko and Deputy Chiefs Jeffrey and Whiteside

Finally, Defendants argue Ms. Hamadmad failed to sufficiency plead the personal involvement of Lt. Horujko and Deputy Chiefs Jeffrey and Whiteside for Claim 4 and Deputy Chiefs Jeffrey and Whiteside for Claims 2, 5, and 6.

As to Claim 4, Ms. Hamadmad fails to allege the requisite personal involvement of Lt. Horujko and Deputy Chiefs Jeffrey and Whiteside because she does not allege that any of the three officers made the decision to prosecute her or made "'knowing misstatements ... to the prosecutor'" or exerted "'pressure or influence, over an individual who [] made the decision to prosecute[.]" *Sykes*, 625 F.3d at 316 (citation omitted).

She also fails to allege the requisite personal involvement for Claims 2, 5, and 6 as to Deputy Chiefs Jeffrey and Whiteside. While Ms. Hamadmad alleges that Deputy Chiefs Jeffrey and Whiteside determined that the protestors who remained near the morning encampment site before Ms. Hamadmad arrived were violating the USR and that Deputy Chief Whiteside told those protestors to disperse, she

14

does not allege that either officer made any determination that the USR applied to prohibit her conduct or participated in her arrest. "[A]n officer's 'mere presence' at the scene of an arrest fails to establish § 1983 liability." *Alexander v. Carter for Byrd*, 733 F. App'x 256, 267 (6th Cir. 2018) (quoting *Burgess v. Fischer*, 735 F.3d 462, 475 (6th Cir. 2013)).

It is not clear whether Defendants are challenging the sufficiency of Ms. Hamadmad's Amended Complaint as to the personal involvement of Lt. Horujko for Claims 2, 5, and 6. (*See* Defs.' Mot., PAGEID # 149; Defs.' Reply, PAGEID # 195.) To the extent Defendants' filings could be construed to raise such a challenge, Ms. Hamadmad sufficiency pleaded that Lt. Horujko was personally involved in the conduct giving rise to Claims 2, 5, and 6; she says that Lt. Horujko told her to leave the South Oval and directed the OSU officers to arrest her. An officer may be held personally liable if he "implicitly authorized, approved or knowingly acquiesced" in the alleged unconstitutional conduct. *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015) (citation omitted).

Accordingly, Claim 4 is **DISMISSED** as to Lt. Horujko in his individual capacity. Claims 2, 4, 5, and 6 are **DISMISSED** as to Deputy Chiefs Jeffrey and Whiteside in their individual capacities.

        **2.**    **Ms. Hamadmad sufficiently alleged facts in support of Claims 2, 5, and 6 as to Lt. Horujko.**

            **a)**    **Claim 2: Fourth Amendment False Arrest**

To succeed on a wrongful arrest claim under § 1983, a plaintiff must prove that the police lacked probable cause. *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th

15

Cir. 2002) (citing *Painter v. Robertson*, 185 F.3d 557, 569 (6th Cir. 1999)). "A police officer determines the existence of probable cause by examining the facts and circumstances within his knowledge that are sufficient to inform "a prudent person, or one of reasonable caution," that the suspect "has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). A probable-cause determination is based on the "totality of the circumstances" and must consider "both the inculpatory and exculpatory evidence." *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000). The determination must include " 'facts and circumstances establishing a statutorily legitimated affirmative justification for the suspected criminal act.' " *Fridley*, 291 F.3d at 873 (quoting *Painter*, 185 F.3d at 570). If "a reasonable police officer would conclusively know that an investigative target's behavior is protected by a legally cognizable affirmative defense", the officer lacks a legal foundation for arrest. *Id.* "In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995).

Ms. Hamadmad was arrested for criminal trespass. "In Ohio, an individual commits criminal trespass by '[k]nowingly enter[ing] or remain[ing] on the land or premises of another' absent 'privilege to do so.'" *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007) (quoting Ohio Rev. Code § 2911.21(A)(1)). A "privilege" is "an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity." Ohio Rev. Code § 2901.01(A)(12). Generally, a person has a privilege to enter and be

16

upon the public areas of public property but a public official or agency that owns or controls public property can revoke that general privilege. *Cleveland v. Dickerson*, 60 N.E.3d 686, 691 (Ohio Ct. App. 2016). Even so, in the context of public property, "a criminal trespass may be inappropriate where, subject to certain time, place, and manner of use restrictions, the defendant is lawfully exercising his or her First Amendment rights to free speech and peaceful assembly." *Id.* at 692.

Defendants argue that the "encampment activity was not constitutionally protected, it violated the [USR], and the police lawfully required the transgressors, including those like [Ms. Hamadmad] joining with them, to cease that activity and leave the area." (Defs.' Reply, PAGEID # 197.) Thus, Defendants contend that the arresting OSU officers had probable cause to arrest Ms. Hamadmad for criminal trespass because the OSU officers asked her "to vacate the area near the planned encampment site" and she "was arrested thereafter while still in the area." (Defs.' Mot., PAGEID # 150.) But Ms. Hamadmad alleges that she was not involved in the morning encampment, she was merely sitting on the grass 75 feet away from the encampment site. And, as discussed below, Defendants provide no basis to find as a matter of law that her conduct was not protected by the First Amendment.

Defendants' Motion is **DENIED** as to Claim 2 against Lt. Horujko in his individual capacity.

### b) Claim 5: First Amendment As-Applied Challenge to the USR

Ms. Hamadmad alleges Lt. Horujko violated her First Amendment free speech rights when he invoked the USR to close the South Oval to her expressive

17

and associational conduct.² The viability of a First Amendment claim depends on three inquiries: (1) whether the speech is protected; (2) "the nature of the forum" in which the speech occurs; and (3) whether the government's restriction on speech satisfies the relevant forum's associated constitutional standard. *Hartman v. Thompson*, 931 F.3d 471, 478 (6th Cir. 2019) (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985); *S.H.A.R.K. v. Metro Parks Serving Summit Cty.*, 499 F.3d 553, 559 (6th Cir. 2007)). Defendants challenge the sufficiency of Ms. Hamadmad's pleadings only as to the first inquiry. (*See* Defs.' Reply, PAGEID # 196.)

"The First Amendment rights of speech and association extend to the campuses of state universities." *Kincaid v. Gibson*, 236 F.3d 342, 347 (6th Cir. 2001) (quoting *Widmar v. Vincent*, 454 U.S. 263, 268–69 (1981)).

Defendants provide no basis to find as a matter of law that Ms. Hamadmad's alleged conduct does not enjoy First Amendment protection. Instead, they argue that "there is no First Amendment right to set up an encampment on public property." (Defs.' Reply, PAGEID # 196–97 (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 297–98 (1984).) But Ms. Hamadmad alleges that the morning encampment was taken down over an hour before she arrived and that she

---

² Ms. Hamadmad also argues the USR function as a "prior restraint" because "[a]s applied, the USR grants sole and total discretion to OSU to declare peaceful and nondisruptive expressive and associational activity off limits on the South Oval." (Am. Compl. ¶ 63.) But "a prior restraint is an administrative or judicial order that forbids protected speech in advance. An action taken after the speech is expressed, like a punishment for disfavored speech, is not a prior restraint." *Novak v. City of Parma*, 932 F.3d 421, 432 (6th Cir. 2019) (cleaned up) (citing *Alexander v. United States*, 509 U.S. 544, 550 (1993)). To this extent, the Claim is **DISMISSED**.

was merely sitting on the grass. Assuming her allegations are true, whether the First Amendment provides a right to set up encampments is immaterial to her conduct.

Defendants' Motion is **DENIED** as to Claim 5 against Lt. Horujko in his individual capacity.

### c) Claim 6: First Amendment Retaliatory Arrest

A plaintiff alleging First Amendment retaliation must show that (1) she engaged in a constitutionally protected activity; (2) the officers' adverse actions caused her to suffer an injury that would likely chill a person of ordinary firmness from continuing that activity, and (3) the officers were motivated, at least in part, by her exercise of her constitutional rights. *Novak v. City of Parma*, 932 F.3d 421, 427 (6th Cir. 2019). Further, "to bring a First Amendment retaliatory arrest claim, a plaintiff must generally show that there was no probable cause for the arrest." *Id.* at 430. Defendants argue Claim 6 fails because Ms. Hamadmad's conduct was not constitutionally protected and the OSU officers had probable cause to arrest her. For the reasons discussed above on Claims 2 and 5, the Court likewise finds Ms. Hamadmad has stated Claim 6.

Defendants' Motion is **DENIED** as to Claim 6 against Lt. Horujko in his individual capacity.

## IV.  CONCLUSION

For the reasons set forth above, Defendants' Motion (ECF No. 17) is **DENIED** as to Claims 2, 5, and 6 against Lt. Horujko in his individual capacity. In all other respects, the Motion is **GRANTED**.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**